# United States Court of Appeals
### For the Eighth Circuit

_____

No. 20-1573
_____

United States of America

*Plaintiff - Appellee*

v.

Bryant Keethe Smith Ford

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: January 11, 2021
Filed: February 17, 2021

_____

Before SMITH, Chief Judge, KELLY and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Bryant Keethe Smith Ford pled guilty to two offenses: conspiracy to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vii), and 846; and

money laundering, in violation of 18 U.S.C. § 1957. The district court[1] sentenced Ford to a term of imprisonment of 168 months for the drug trafficking conviction and a concurrent term of 120 months for money laundering. Ford appeals the court's Sentencing Guidelines calculation and denial of his motion for a downward variance. We affirm.

## I.      BACKGROUND

In June 2017, Drug Enforcement Administration ("DEA") agents in Arkansas began investigating a drug trafficking organization in Fayetteville. Through the use of confidential sources, the agents obtained information indicating Ford was distributing multiple pounds of marijuana and multiple ounces of cocaine in Arkansas. Meanwhile, DEA agents in Colorado were investigating Long Phan, who was operating a drug trafficking organization in Colorado. In October 2017, agents intercepted communications revealing that Phan was a source of supply for Ford and that Ford planned to travel to Colorado to purchase 35 to 40 pounds of marijuana.

Agents conducted surveillance on Ford and Phan and observed them meet at a known "stash house" in Denver, Colorado. Through continued intercepted communications the agents learned that Ford would be sending payment for the marijuana he received in Denver to Phan via FedEx. At the Englewood, Colorado, FedEx Office, agents used a canine service dog to inspect a package mailed by Ford to Phan. After the dog alerted, agents opened it and found $32,000 in currency.

Two days later, agents learned of another planned transaction in which Phan and Ford scheduled to meet in Aurora, Colorado. During the call, Phan stated there were "45 good ones instead of 50 this time," which agents understood referenced

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

-2-

marijuana. Agents resumed surveillance of Phan and Ford, observed them meet in a hotel parking lot, and followed them as they drove in tandem to a known "stash house" in Arapahoe County, Colorado. The pair stayed at the house for a short time and then left in different directions, each followed by agents. Phan drove to a FedEx office to retrieve the already seized package with the money Ford had sent. When Phan was unable to pick up the package, he called Ford. The pair discussed the money being seized by the DEA, how the package had their names on it, their suspicion that they were under investigation, and what excuse they would give to the marijuana supplier who was owed money.

While some agents were monitoring Phan, Aurora Police Department officers working in conjunction with the DEA approached Ford who was in a vehicle at a restaurant parking lot. The officers used a service canine to inspect the vehicle. After the canine alerted, officers searched the vehicle and found two duffle bags containing 45 pounds of marijuana in individually wrapped one-pound bundles.

In less than two years, Ford encountered law enforcement several more times. In April 2019, approximately a year and a half after Ford's arrest by the Aurora police officers, Ford was a passenger in a vehicle stopped by the Kansas Highway Patrol. During a search of the vehicle, the trooper discovered 137 pounds of marijuana and 4.4 pounds of THC "vape" cartridges. Ford told the trooper that he was not concerned about the marijuana because none of it belonged to him. Ford also told the trooper that he was a rapper and the driver of the vehicle was his bodyguard. Despite disclaiming ownership interest of the marijuana to the trooper, the next day Ford posted on his Facebook account a message, stating: "Biggest Lost I've Ever Took in My Life Head Hurt N Prolly Won't See Me On Social Media For Awhile." The investigating DEA agents believed the message referenced the 137 pounds of marijuana seized by the Kansas Highway Patrol. The following month law enforcement stopped Ford's vehicle in Arizona. A vehicle search revealed 66 pounds

of marijuana, 500 vials of THC oil, 200 grams of THC wax, 200 grams of THC syrup, and 200 pre-rolled marijuana cigarettes.

In addition to the intercepted communications and law enforcement encounters, investigators obtained information about Ford's drug trafficking organization through controlled buys, his posts on several different social media accounts, recorded jail calls, and statements from cooperating witnesses. For instance, Ford posted pictures on his social media account depicting images of large amounts of cash bundled together with rubber bands. They also learned Ford used over $129,000 in cash to purchase vehicles, including a 2015 Range Rover Evoque for $26,800; a 2015 BMW i8 coupe for $63,000; and a 2015 Chevrolet Corvette for $40,000.

Law enforcement eventually obtained a warrant and searched Ford's residence in Fayetteville along with his car. Inside the house officers found $15,016 in cash in the master bedroom, suspected high value jewelry in the same room, an electronic money counting machine in a utility closet, and 738 THC cartridges plus two baggies of marijuana in the kitchen. In the trunk of Ford's BMW, officers found seven vacuum-sealed packages of marijuana, each containing one-pound of marijuana. Although Ford denied using safe deposit boxes to store cash, another individual told law enforcement that, at Ford's direction, she would place envelopes full of cash in a safe deposit box opened under her name. This same individual also informed officers that Ford directed her to register various vehicles he purchased in her name, including a BMW i8 coupe, a Range Rover Evoque, a Fisker Karma, a Dodge Challenger, a Bentley sedan, and a Chevrolet Corvette. Agents seized $137,000 in currency from the safe deposit box rented by the cooperating individual and an additional $111,076 held in a safe deposit box opened in Ford's name.

Ford pled guilty to conspiracy to distribute marijuana and money laundering. He also agreed to forfeit the currency seized from the two safe deposit boxes and his house, three vehicles (a 2015 BMW i8 coupe, 2015 Range Rover Evoque, and 2012

Fisker Karma), and two 9 mm pistols. Ford's Sentencing Guidelines range was calculated to be 168 to 210 months, based on a total offense level of 32 and criminal history category IV. The court sentenced Ford to a term of imprisonment of 168 months on the drug trafficking count and a concurrent term of 120 months for money laundering. It also imposed a fine in the amount of $20,000. Ford timely appealed.

## II.   DISCUSSION

Ford challenges the district court's application of two Sentencing Guidelines enhancements: a four-level increase under U.S.S.G. § 3B1.1(a) for being an organizer or leader of criminal activity involving five or more participants or which was "otherwise extensive," and a two-level increase under U.S.S.G. § 2D1.1(b)(16)(E) for committing the offense as part of a pattern of criminal conduct engaged in as a livelihood. We review a district court's factual findings for an enhancement for clear error and its legal conclusions *de novo*. United States v. Sherrod, 966 F.3d 748, 754 (8th Cir. 2020) (quoting United States v. Cordy, 560 F.3d 808, 817 (8th Cir. 2009)). The government bears the burden of proving an enhancement applies by a preponderance of the evidence. United States v. Musa, 830 F.3d 786, 788 (8th Cir. 2016).

With regard to the leadership role enhancement, U.S.S.G. § 3B1.1(a) allows for a four-level increase to a defendant's offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." A "participant" is defined as a person who is "criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1. In order for the enhancement to be properly applied, the district court must make a finding that the defendant organized or led another participant. Musa, 830 F.3d at 788. Here, the court, relying on the undisputed statements in the Presentence Investigation Report ("PSIR"), found that Ford's drug trafficking activities met the "otherwise extensive" prong of § 3B1.1(a) and identified

two participants that Ford directed. The court also found that Ford's drug trafficking organization included more than five participants and identified with specificity the involvement of more than five participants. Having carefully reviewed the record, we are confident that the district court correctly understood and applied § 3B1.1(a). We conclude the district court's findings are supported by the record and the court did not err in applying a leadership role enhancement.

Ford also challenges the district court's application for criminal livelihood, which consisted of a two-level increase to his offense level under § 2D1.1(b)(16)(E) of the Sentencing Guidelines. Ford asserts there was insufficient evidence to prove the sale of drugs was his primary occupation, arguing the district court improperly ignored evidence that he derived income from a clothing line, his music career, and gambling. In support of his argument, Ford cites to three paragraphs in the PSIR. The first one included Ford's assertion made during a law enforcement interview in which Ford stated the business he co-owned, Northwest Arkansas Restoration, did not make him any money but he earned a living through a clothing line and his music career. The second paragraph cited by Ford described 1099-MISC tax forms filed by various casinos. We note the court sustained Ford's objection to this paragraph and indicated it would not consider the information for sentencing purposes. In the other paragraph cited by Ford, he self-reported that his clothing business was "a small operation" that he conducted as a "side project." Although Ford reported the business earned approximately $2,000 a month, agents were unable to corroborate Ford's representation and learned that most, if not all, of the individuals who wore clothing with Ford's graphic designs were persons connected to his drug trafficking operation. Outside of his clothing business, Ford reported to the PSIR writer that he was last employed at a Dunkin' Donuts where he worked for approximately one month and was paid minimum wage.

For the two-level increase under § 2D1.1(b)(16)(E) to apply, the evidence must establish that (1) in a 12-month period the defendant received an income from the

criminal activity that was 2,000 times the federal minimum wage, and (2) during the 12-month period, the criminal activity was the defendant's primary occupation. U.S.S.G § 4B1.3 cmt. n.2. At sentencing, Ford acknowledged that he made money from the sale of marijuana, but argued the court was unable to quantify the amount without making assumptions. Ford contends on appeal the district court erred by applying the criminal livelihood enhancement because it did not make a specific finding on the second prong, which requires criminal conduct to be Ford's primary occupation in a 12-month period. The court made thorough findings regarding application of the first prong of the criminal livelihood enhancement. At the conclusion, the court asked Ford if it "failed to address or resolve any of defendant's objections." Ford responded, "No." When "a defendant fails to timely object to a procedural sentencing error, the error is forfeited and may only be reviewed for plain error." United States v. Phelps, 536 F.3d 862, 865 (8th Cir. 2008).

In determining a defendant's primary occupation, a court may consider evidence regarding the market value of the drugs sold as well as evidence that defendant lacked gainful employment. United States v. Denson, 967 F.3d 699, 707 (8th Cir. 2020) (citations omitted). The record contains substantial evidence about the large quantities of marijuana involved in Ford's drug trafficking operation; however, there is little evidence about gainful employment. There is no evidence about how much money Ford purported to have earned from his music career and he objected to the court considering the 1099-MISC tax forms regarding his casino gambling. Even considering Ford's self-serving statement that he earned $2,000 a month from his clothing business, it is plain on this record that this income could not serve as Ford's primary occupation. In addition to purchasing vehicles for $89,800 in cash in February 2019 and having in excess of $250,000 in cash in July 2019, Ford rented a residence in Fayetteville for $1,195 per month and he paid $1,894 per month for an apartment in Texas. Ford also reported a shoe collection to be worth an estimated $20,000. The undisputed facts in the record lead to only one rational conclusion: Ford's drug trafficking was his primary occupation during the relevant

12-month period. Ford cannot show any error that affected his substantial rights. See United States v. Isler, 983 F.3d 335, 341–343 (8th Cir. 2020) (concluding the defendant cannot succeed on his sentencing challenges because, under plain error review, he must show an error that affected his substantial rights).

Lastly, Ford challenges the district court's denial of his motion for a downward variance. We review the denial of a motion for downward variance by reviewing the sentence for reasonableness, applying a deferential abuse of discretion standard. United States v. Acosta, 619 F.3d 956, 962–63 (8th Cir. 2010) (quoting United States v. Gonzalez, 573 F.3d 600, 607 (8th Cir. 2009)). Ford's within-Guidelines sentence is presumptively reasonable. United States v. Chavarria-Ortiz, 828 F.3d 668, 672 (8th Cir. 2016). When explaining the reasons for its sentence, the court identified several mitigating factors, such as Ford's mental health issues, drug addiction, and lack of youthful guidance. The court also detailed a number of aggravating factors, including Ford's position as distributor of the single largest marijuana trafficking organization the court had ever encountered, possession of a firearm while engaging in drug trafficking, a significant criminal history that is indicative of a lack of respect for rules and the law, a high likelihood to recidivate unless Ford changes his attitude, and concern about public safety. The district court thoroughly discussed the factors set forth in 18 U.S.C. § 3553(a), took into consideration mitigating factors identified by Ford (as well as aggravating factors), and adequately explained the reasons for the sentence. Ford has neither rebutted the presumption of reasonableness nor demonstrated that the court's refusal to vary downward rendered the sentence substantively unreasonable.

## III.    CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____